1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10    EMILIO TORRES,

11            Petitioner,                    No. CIV S-07-1689 LKK CHS P

12        vs.

13    SHARON PROSPER,

14            Respondent.         FINDINGS AND RECOMMENDATIONS

15    _____/

16                      I.  INTRODUCTION

17            Emilio Torres is a state prisoner proceeding with counsel in this petition

18    for writ of habeas corpus pursuant to 28 U.S.C. §2254.  Torres attacks his robbery

19    conviction entered in the Sacramento County Superior Court, Consolidated Information

20    No. 00F10227.  Torres pleaded no contest to the robbery count at issue here as part of

21    a negotiated plea agreement on multiple charges in several cases which were

22    consolidated for sentencing. No direct appeal was had, as it was waived as part of the

23    plea agreement.

24            A prior report and recommendation was entered on December 12, 2008.

25    That report was adopted on August 3, 2009, by the Honorable Lawrence K. Karlton,

26    Senior Judge, except as to the issue of ineffective assistance of counsel, which was

                                              1

1    remanded for further proceedings.  An evidentiary hearing was held on November 16,

2    2009.

3            The  remaining issue for consideration in this case is whether William

4    White, Esq., Torres' appointed counsel from the time after his preliminary hearing up

5    until entry of his negotiated plea, rendered ineffective assistance of counsel by failing to

6    credit alleged claims by Torres that he was innocent of the robbery, and that five

7    witnesses to the events surrounding the robbery would testify favorably for him if given

8    the opportunity to do so.

9            In support of his position, Torres submitted with his original petition his

10   own Declaration under penalty of perjury, and those of the five witnesses.

11   Subsequently, he and all five witnesses testified at the November 16, 2009 evidentiary

12   hearing, in addition to Rosa Torres, mother of the petitioner, and William White, Esq.,

13   whose assistance of counsel is at issue here.  Both parties requested time to file

14   supplemental briefs, which have now been docketed.

15

16                              II.  BACKGROUND

17

18           The state court proceedings which form the background of this case are

19   quite complex.  There were multiple cases and voluminous charges.  Many of the

20   essential facts are recorded in the transcript of the consolidated preliminary hearing

21   held on November 18, 2001, in Case No. 00F00392 (the robbery at issue in this

22   proceeding), and Case No. 00F10227 (fraud and other unrelated charges).  Torres

23   contests evidence given at this preliminary hearing as will become apparent, but  that

24   proceeding informs the complicated background of this case.

25           Ultimately the multiple charges involved in the November 18, 2001

26   preliminary hearing were consolidated for purposes of the negotiated plea agreement,

together  with a separate and distinct jury conviction of second degree burglary and possession of stolen property and burglary tools involved in the burglary of a company, Beazer Homes, on February 19, 2002.  It was after this jury conviction for second degree burglary and possession of stolen property and burglary tools that the seven count Amended Consolidated Information No. 00F10227 was filed.

The robbery conviction under attack in this case was charged in Count One of the amended consolidated Information, although it was the last offense to occur, chronologically.

Count One alleged that on December 21, 2000, Emilio Torres committed second degree robbery by taking personal property from person, possession, and immediate presence of Jonathan Tisdale, Christie Nixon, Randy Blackburn, and Lisa Richards.  It was further alleged that Torres committed these crimes, serious felonies, while out on bail after conviction on a primary offense (the jury convictions regarding burglary of Beazer Homes).

It is this crime (second degree robbery) to which the testimony at the November 18, 2001 evidentiary hearing primarily pertained, but the relationship of the other convictions and the parties involved in them is apparent.  The events leading to the robbery charge began with a San Joaquin County Sheriff's Department investigation concerning fraudulent applications for credit cards in the names of multiple individuals who had not submitted them.  All of the applications used the address of Jonathan Tisdale, one of the eventual victims/witnesses to the robbery count.  The execution of a search warrant at Tisdale's residence on November 14, 2000 produced mail from credit card companies addressed to various people.  Tisdale, who was present during the search, explained that he had given Emilio Torres permission to use his address, in return for the purchase of marijuana by Tisdale from Torres, at a reduced price.

Tisdale identified a separate address as the home of Emilio Torres, and a

1   separate search warrant was executed at that home the same day.  That second

2   search produced a quantity of methamphetamine, which formed the basis for Count

3   Two of the Amended Information.  Count Three was the result of the presence of a

4   9mm assault rifle at Torres' home.  Count Four charged possession of a stolen vehicle

5   which was found in the garage of Torres' residence.  Count Five was based on access

6   to a computer system without permission, resulting in the possession and compromise

7   of the personal information of some 5,000 employees of the California Department of

8   Justice.  Count Six charged the unlawful acquisition and use of personal information of

9   eleven private individuals for unlawful purpose, resulting essentially from the mail

10  recovered from Tisdale's home.  Count Seven charged possession for purpose of sale

11  of methamphetamine which had been found in Torres' home.

12          Absent a plea agreement, Torres faced exposure to a sentence of thirty

13  four years and four months, based solely upon the seven counts of the amended

14  consolidated Information. Ultimately, he pleaded nolo contendere in exchange for a

15  sentence on these seven counts and the three count jury verdict case, for a total

16  maximum sentence of fifteen years imprisonment.  The multiple other cases and counts

17  were dismissed.  The plea agreement included a single strike rather than the multiple

18  strikes Torres otherwise faced.

19          Torres' position on the sole issue remaining in this case is that his

20  appointed lawyer, William White, Esq., did not interview the alleged victims of the

21  robbery because he unreasonably credited the testimony of law enforcement officers

22  who testified at the preliminary hearing regarding their investigation and the statements

23  given by the victims/witnesses.  Torres claims that counsel ignored his insistence that

24  he was innocent of the robbery count and that the witnesses would have supported his

25  claim of innocence, if counsel had contacted them.

26

III.  TESTIMONY AT THE DECEMBER 18, 2001
STATE COURT PRELIMINARY HEARING

This summary of evidence at the lengthy preliminary hearing is limited to the offense under attack in this proceeding.  Some evidence regarding other matters relates to the reasonableness of the plea bargain at issue, and is therefore included.

**JOSEPH ARILA'S TESTIMONY:**

Joseph Avila testified that he is an identification technician in the evidence lab of the Sacramento Police Department.  At the time of the evidentiary hearing he had been an identification technician for about 23 years.

Avila testified that he was provided with a four page document which appeared to be a photocopy of a Sacramento County Sheriff's Department report. Examination of the report revealed two visible fingerprint impressions and a total of 34 latent print areas.  There were also two areas of possible blood on the document he examined, on the front and back pages.

Avila identified People's Exhibit 16 as a photograph containing latent number eight and a portion of latent number one.

On cross examination, Avila explained that his role was strictly  the identification of latent prints.  He did no comparison.  He photographed 34 different areas of latent prints.  He had received a copy of another technician's report which had identified latent number eight as belonging to a particular person.

**BRIAN MALLORY'S TESTIMONY:**

Brian Mallory testified that he is an identification technician with the Sacramento Police Department.  He was previously employed by the Federal Bureau of Investigation as a fingerprint examiner for approximately three years.

1    Mallory was shown a photograph of latent number eight, found by

2  identification technician Avila.  He testified that he compared it to the original inked

3  fingerprint card of Emilio Torres, and found it to contain fingerprint impressions of

4  Torres' right index and right middle fingerprints.

5    Mallory testified that he is one hundred percent positive of his results.  He

6  explained that it is policy to identify only one latent print for purpose of a preliminary

7  hearing, and that he had contacted the Deputy District Attorney to ask if more were

8  necessary in this case.

9    On cross examination, Mallory testified that the identification process he

10  uses is to match the ridge characteristics between the inked print and the latent print.

11    Mallory testified about the process of identification of a latent print and

12  then stated that he found twelve matching ridge characteristics on the right index finger

13  impression and fourteen matching ridge characteristics on the right middle finger

14  impression.

15    A fully rolled inked fingerprint can contain anywhere from 75 to 150 ridge

16  characteristics.  Avila further testified that he has no minimum standard of matching

17  ridge characteristics in order to give an assessment, however the minimum number that

18  he has ever used for a one hundred percent identification is eight.

19

20  **ALBERT McPHERSON'S TESTIMONY:**

21    Albert McPherson testified that he is an assistant range master for the

22  Sacramento County Sheriff's Department.  He was asked by Detective Souza to

23  examine a firearm.  He described the firearm as a nine millimeter carbon manufactured

24  by Feather Industries, equipped with a collapsible stock, two pistol grips, barrel shroud

25  and a high capacity magazine.  It is semi automatic.

26    The Court inquired whether this is an assault weapon, to which

1   McPherson responded that it is not in the specific list of assault weapons, "but it fits the

2   assault weapon category under the newest laws."

3          Asked on cross examination why, if the weapon meets the criteria of an

4   assault weapon in the Penal Code, it is not listed as such, McPherson testified to his

5   understanding that the listing is no longer updated because the proliferation of brands,

6   makes, and models of guns has become too extensive to keep up with.  "So they made

7   criteria. If a weapon is equipped with certain items, it puts it into a category of assault

8   weapon."

9          McPherson did not attempt to identify the owner of the rifle, but did have

10   the "property warehouse check the numbers and it didn't come back as stolen."

11

12   **PETER KEVIN CONRAD'S TESTIMONY:**

13          Peter Kevin Conrad testified that he is a Sergeant assigned to the high

14   crimes task force of the Sacramento Sheriff's Department.  He assisted in the service of

15   a search warrant at 77 Audia Circle in Sacramento County on November 14, 2000.

16          Conrad testified as to the identification of an Ohaus brand triple beam

17   scale found on a table in the master bedroom closet of the residence and a Macy's

18   charge card in the name of Emilio Torres, found in the same closet.  There was

19   marijuana on the floor of the closet.

20          Conrad also testified to the presence of a Meed (sic) brand memo pad

21   found on the upper shelf of the south closet wall, which contained "a name list and

22   numbers."

23          Conrad went on to testify about other quantities of marijuana, a calculator,

24   and photographs of Emilio Torres and a small child.  In addition, there was a package

25   of "large plastic bindles" which he also described as "baggies or coin type bags."

26          Methamphetamine was found on the Ohaus scale and on a plastic CD

case on the table in the closet.  Other separate quantities of methamphetamine were found in the master bedroom at 77 Audia Circle.  The parties stipulated as to the identification of all suspected quantities of methamphetamine found in the residence, for purposes of the preliminary hearing only.

On January 16, 2001, a second search warrant was executed at the same location, during which Conrad found a cell phone in the same room where the other items had been found.

On cross examination, Conrad testified that he was at the Audia Circle address for two separate searches, one on November 14, 2001 and another on January 16, 2001.  Initially he had no search warrant for the November 14, 2001 search.  On that day, Conrad first executed a search, with a warrant, at an address on Hollyhurst Way (Tisdale's home).  He explained that the course of that investigation led to the Audia Circle address, for which a warrant was subsequently obtained.

**OFFICER VINCENT FRANCOIS' TESTIMONY:**

**Interview of Jonathan Tisdale:**

Officer Vincent Francois of the Sacramento Police Department testified at the preliminary hearing that on December 23, 2000, he went to 6028 Hollyhurst Way in response to a call regarding a robbery.  He spoke with Jonathan Tisdale, who reported that he had been robbed at his residence (6028 Hollyhurst Way) two days prior, on December 21, 2000, at about 9:00 p.m.  He responded to a knock on his door, and upon asking who was there, was told it was "Mill" (sic), whom he recognized as his friend, Emilio Torres, elsewhere identified and referred to herein as "Mil."

Tisdale opened the door, and Torres and five or six other persons entered the home.  Tisdale told Officer Francois that Mil pushed him into the kitchen, threw some papers on the counter and told Tisdale to "fix this."  The papers were a copy of a

1  Sacramento County Sheriff's Department report.

2         Thereafter, Tisdale heard Mil tell his friends to "take it all."  Yoyo

3  (subsequently identified as Jose Pulido) smashed Tisdale's head against a kitchen

4  counter several times.  Tisdale was then  placed in a headlock, and taken to the living

5  room, where his head was slammed against the hardwood floor.  He heard Emilio say

6  "Don't call the cops or we will kill you."  Torres also told Tisdale that he would not get his

7  things back until he "fixed the report."

8         Francois testified that at the time of the December 23 interview, Tisdale

9  had bruises and a swollen upper lip, where he had approximately seven stitches.

10        Tisdale told Officer Francois that he believed the robbery was related to

11  the information he had provided to detectives regarding the Sheriff's report.

12        On cross examination, Francois stated that Tisdale explained his delay in

13  reporting the robbery by stating that he wasn't sure what he wanted to do.  He was

14  scared, and wanted to talk it over with his girlfriend, to make certain that he was not

15  putting her in danger.

16        Francois also acknowledged that Tisdale did not say that Torres had

17  personally struck him during the robbery.  Francois testified that Tisdale was not afraid

18  of Emilio Torres one on one, but was afraid of him "when he comes around with all of

19  his friends."

20

21  **OFFICER ROBERT FUENZALIDA'S TESTIMONY:**

22  **Interview of Christy Nixon:**

23        Robert Fuenzalida, Patrol Officer with the Sacramento Police Department,

24  also responded to the call on December 23 regarding the December 21 robbery, and

25  interviewed Christy Nixon.  He testified that Nixon told him that on December 21, 2000,

26  she was walking downstairs and saw approximately ten people walk into the house

where she was staying.  When they entered, she tried to go upstairs, but Mil "grabbed her," and sat her on the couch.  He then sent one of the other men who had walked in with him to see if anyone else was upstairs.

Nixon said that a big Hispanic male, about six foot three, 300 pounds, stood in front of Jon (Tisdale) and told them not to move. She then heard Mil ask Jon to explain why he was talking to the police.  Thereafter she saw people taking items out of the house, including a TV and Christmas gifts.  She saw the "big guy" punch Jon and bang his head against the counter and refrigerator.

Fuenzalida testified that Nixon told him that she did not know anyone but Emilio, for whom she gave a physical description.  She said that she had seen him previously at the house, talking to Jon.

On cross examination, Fuenzalida was given an opportunity to look at the report and clarified his testimony to indicate that it was the large Mexican male who hit Tisdale, rather than Emilio.

Fuenzalida further acknowledged that Nixon said that once the beating started she "just looked down" and did not look around any further, because she was scared.

**DETECTIVE DAVID SOUZA'S TESTIMONY:**

**Interview of Jonathan Tisdale**:

Detective David Souza of the San Joaquin County Sheriff's Office, who testified at length concerning Torres' other offenses, also testified that when he became aware of the Tisdale robbery he began an investigation into that incident.

Souza testified that he interviewed Jonathan Tisdale, who told him that on the night of the robbery, he answered his door and Emilio Torres forced his way in.  He was taken to the kitchen, and numerous other people entered the home.  Torres

wanted to know why Tisdale had given information to the police about Torres.  Tisdale reported that he had been beaten, but was not sure whether by one or more persons. He identified Yoyo (whom Souza identified as Jose Pulido) as having beaten him.  At the time of the interview, Tisdale had a cut lip, and Souza could see stitches there. Tisdale said he sustained the injuries while talking with Torres, and that Torres left a copy of the sheriff's department report in the house.  Torres also directed his companions to take personal property from the home, which they did.

On a later occasion Souza displayed a photographic lineup to Jonathan Tisdale, who identified a photograph of Emilio Torres as his assailant.  Tisdale was also shown a photographic lineup from which he identified a photograph of Jose Pulido as Yoyo.

**Interview of Christy Nixon:**

Detective Souza also testified regarding his interview with Christy Nixon. Nixon said that she was walking down the stairs at the time the robbery began.  She heard voices, but could not identify them.  Jonathan Tisdale later told her that Emilio Torres "had been one of the suspects at the residence during the robbery."  During the robbery, she sat on a couch in the living room with Randy Blackburn and Lisa Richards, who also lived at the residence. Souza showed Nixon a photographic lineup, but she could not identify anyone.

On cross examination, Souza said that Nixon refused to speak with him, and that he only got her to talk to him by going to her place of employment.  He said that she was not cooperative and was afraid of Emilio because of what had happened. Upon further questioning, Souza acknowledged that Nixon had not said she was afraid of Torres, but that he had "ascertained that."  Nixon told Souza that no one threatened her or threatened to take her car.

**Interview of Randy Blackburn:**

Souza also interviewed Randy Blackburn, another of Jonathan Tisdale's tenants. Souza explained that the home is a two story residence owned by Jonathan Tisdale, who rented space to Christy Nixon, Randy Blackburn, and Lisa Richards, who was Blackburn's girlfriend.

Souza testified that Blackburn was told to sit down during the robbery. He did so, and could hear some of the events, but was unable to identify any of the assailants.  He did describe items which were taken from various residents of the home. These included a Nextel I600 cell phone which belonged to him.  Souza testified that when a search warrant was executed at Emilio Torres' home, the missing cell phone was recovered from Torres' bedroom.

**Interview of Lisa Richards:**

Souza interviewed Lisa Richards, who said that during the robbery, she and Blackburn were in the same room.  Richards heard Nixon calling for Blackburn, who stood up, but was told by three men to sit down.  Numerous persons then entered the home. Nixon could not identify any of the intruders.  Sitting on the couch, though, she saw a young male with a bigger man standing beside him demanding "Jon, how could you do this."  Richards further said that the younger man "also got into Christy Nixon's face," and yelled at her, asserting that she had "told them I'm a crack dealer." The man also threatened to take Christy Nixon's car. Moreover, he told Richards and Blackburn that he knew who they were and knew that they had not said anything to the police.

Richards further reported that the large male grabbed Jon Tisdale from behind, and began to beat his head into the kitchen counter, causing him to bleed considerably.  Richards took Tisdale to a medical center for treatment, where he received stitches.

1    Richards was unable to identify anyone from a photographic lineup. She

2  said that Jon Tisdale told her that Mil was the one who had "done this," and that Jon's

3  brother, Matthew Tisdale, said that all of the men were family members.

4    On cross examination, Souza acknowledged that only Jonathan Tisdale

5  was able to identify Emilio Torres from a photographic lineup.

6  **Interview of Matthew Tisdale:**

7    Souza was asked about Matthew Tisdale, Jonathan's brother.  He testified

8  that Matthew was in  the garage during the robbery, and that although he did not see

9  Emilio Torres, he heard his voice.

10    Souza acknowledged on cross that Torres was not at the Audia Circle

11 address during execution of the search warrant that produced the telephone, but

12 pointed out that a file containing the previous criminal case had been found, missing the

13 four pages that "he (Emilio) said he had taken to Jonathan Tisdale's house."

14    Souza also acknowledged that Pulido (Yoyo) had pleaded guilty to beating

15 Jonathan Tisdale.

16    On re-direct examination, Detective Souza testified that during the search

17 at Audia Circle, Jose Gutierrez was present, and said that he was paying monthly rent

18 to live there.  Yoyo  and Adrien Madrono were also there.

19    Asked on redirect if it were possible that someone else took the four

20 pages to Tisdale's house, Souza responded "yes but Emilio has already told me that he

21 did."

22

23                IV.  TESTIMONY AT THE NOVEMBER 16, 2009
                        FEDERAL EVIDENTIARY HEARING
24

25 **CHRISTY NIXON'S TESTIMONY:**

26    At the federal evidentiary hearing on November 16, 2009, Christy Nixon

was the first witness called on behalf of Emilio Torres.  She testified that on the night of the robbery she did not reside at Tisdale's residence, but was there at that time, sitting on the couch.  Jon answered the knock at the door, and some men pushed him into the house, had words with him, and took things.

Nixon testified that she was never contacted by the police or interviewed.  She was never asked if Emilio was present, and does not  know him.  She was never contacted by petitioner's appointed attorney, William White, or by anyone else on his behalf, and was not subpoenaed for trial.

Asked if she was later interviewed by others and asked to put her recollection down in writing, she said no.  Shown a copy of her sworn Declaration and asked to identify it, she did so, but noted that this occurred years later.  Asked to tell the story in her own words, she said that Jon let his assailant in, and was taken to the kitchen, where his head was hit on the counter.  From there, they took him to the living room.  She could hear some words but could not see.  Things were taken, and they left.  She could only hear what happened.

On cross examination, she acknowledged that she still knows Jon Tisdale, who is now her ex husband.  At the time of the robbery, they were friends.

Nixon also testified on cross examination that she was not walking down the stairs at the time of the robbery, but rather, was on the couch watching television.  She saw multiple men enter the house, but no one touched her.  She does not remember size or description of the men.  She thinks Jon hit his head on the counter.  She was scared and probably looked down.  She does not remember someone saying "don't call the cops," and does not believe that the police came that night.  She does not remember speaking with police Officer Fuenzalida, or giving any physical description of the assailants.  She does not know who Jon's friends were at that time.

Nixon acknowledged that  on November 14, 2000, weeks before the

robbery, police officers came to the house regarding mail.  Asked if she told them Mil was involved in selling drugs, she responded that she does no know anyone by that name.  She did not tell police that she was with Jon when he delivered mail to Emilio Torres.

Nixon testified that she only remembers speaking with police officers before the robbery, not after.  She does not remember Detective Souza or recall telling him that she saw Emilio or that Jon told her Emilio was there.

Nixon testified that she does not remember who came to talk to her about the case.  She did not know who Emilio Torres was, so she did not say she was afraid of him.

Nixon further testified that she was never shown either a live or a photographic lineup.

The Declaration given some years later was written in her own words when she was contacted by a man.  Jon said that they needed to meet at a restaurant and give their statements.  She does not remember what the purpose was.  They typed it and brought it to her to sign, and she reviewed and signed it.

**LISA RICHARDS' TESTIMONY:**

Lisa Richards testified that she recalls the night of the robbery.  She was in the living room, watching television.  There was a knock at the door, and some four to six men entered the house, some from the front door, and some from the back.  They told the people watching television to stay where they were and proceeded to rummage through the house.  One of the men hit Jon; then they took some things and left, after about ten minutes.

Richards testified that she has never met and does not know Emilio Torres.

1    Richards was contacted in 2005 regarding a Declaration of the events.

2 She kept her copy,reviewed it before the evidentiary hearing, and testified that the

3 statement is true.  Upon being asked to do so, Richards read paragraph five of the

4 Declaration and affirmed its truth.

5    Richards recalls being interviewed, but not by uniformed police. She does

6 not recall being interviewed by counsel for Torres, and stated that paragraph seven of

7 the Declaration is true. She was not subpoenaed to testify prior to the federal evidentiary

8 hearing.

9    On cross examination, Richards acknowledged that on the night of the

10 robbery, she was living at the Tisdale home, with her boyfriend, Randy Blackburn,

11 Jonathan and Matthew Tisdale, and Christy Nixon.  She, Randy, and her son were

12 playing Play Station in the same room.

13    Richards recalls Christy calling for Randy when the door opened.  Randy

14 stood up, but was told to sit down by three men, and did so, as numerous people

15 entered the house.

16    Richards testified that she does not recall a young man handing Jonathan

17 some paperwork, but she does recall a big male standing next to Jonathan.

18    Richards also remembers seeing a young man "get in Christy's face and

19  yell at her...you told them I'm a crack dealer?"  Asked if that male threatened to take

20 Christy's car, Richards responded that they did say something about the car.

21    When the men first came through the door, the young male spoke to Lisa

22 and Randy, stating their names and saying that they had not said anything to the police,

23 and that "this has nothing to do with us."

24    The police had been to the Tisdale house about a month before the

25 robbery and had spoken with Richards about mail Jonathan Tisdale was receiving, but

26 that they knew nothing about that.

Richards testified that she did recall a large man grabbing Jonathan from behind and beating his head into the counter top.  Her son began to scream and there was a large amount of blood on the kitchen floor.  Jonathan was then taken to the opposite side of the house, out of her line of sight.

Richards testified that she does not recall Jonathan saying who "did it," or that all "the suspects" were family members.

That night, Richards, her child, and Randy left the home and never returned.  She acknowledged that she was fearful.

Richards testified that the only time she ever spoke to anyone regarding the events was at the time she gave her Declaration. She is not certain that she never spoke to a police officer, but she does not remember anyone in uniform.  The statement was written in her own words.  She did not know that Mil was Emilio.  When shown photographs she did not know what he looked like.

**JON RANDALL BLACKBURN'S TESTIMONY:**

Randy Blackburn testified that he was present during the robbery, and was watching television, when a "bunch" of people came in through the front door.  He said the event was "pretty much over before – you know, it stopped and it started."

Blackburn recalls "the cop, Dave Souza" being at his workplace a few times, "[b]ringing pictures and stuff," and asking if Emilio was the one who did it, but he did not see anybody that night.  He was never interviewed by Torres' lawyer, and he was not subpoenaed for trial.

Blackburn was asked whether he was approached in July of 2005 regarding his recollection of the robbery.  He said he had no idea, and did not recall making a statement. Specifically with regard to paragraph seven of his Declaration under penalty of perjury, Blackburn denied ever having spoken to the District Attorney and

Torres' previous attorney and telling them the contents of his Declaration.

Blackburn testified that he recalls being interviewed when he lived on Corvair Street, but he does not remember exactly who the interviewers were.  After that the district attorney asked him to come to his office once, and he did so.  He never really talked about the case.  "It was right at the time of some transition in the case, and they cut us loose."

Blackburn testified that he did not know Torres, although he knew who he was, and knew him by sight.

On cross examination, Blackburn acknowledged that at the time of the robbery he was living at Jonathan Tisdale's home, with Jonathan's brother, Matthew, and his own girlfriend.  He does not remember if Christy Nixon was living there, but she was there at the time of the robbery.  She was Jonathan Tisdale's girlfriend.

Blackburn was sitting on the couch playing video games.  He saw Jon go to answer the door, but saw nothing after that.  He turned in his cell phone, which he said was not stolen.  He did not fear for his safety.  He does not recall speaking to a probation officer, and never told anybody he feared for his safety.

Blackburn acknowledged knowing that police came to the home prior to the robbery, concerning mail that Jonathan was receiving.  He was not there at the time, and was never asked about the matter.

Blackburn testified that he did not recall one of the intruders speaking to Lisa and him about knowing who they were and that they had not provided information to the police.

Blackburn testified that he signed the Declaration, which someone else had typed, but he did not say everything in the statement "the way it's wrote up."  He imagines that he reviewed it first.  He testified that despite his signed Declaration, he did not help take Tisdale to the hospital after the robbery.  Moreover, he does remember

1    speaking with the "DA," but his girlfriend, Lisa Richards, did not do so.

2           On re-direct examination, Blackburn again acknowledged speaking to a

3    D.A.,  but asserted that he was not contacted by defense counsel at any time.

4

5    **MATTHEW TISDALE'S TESTIMONY:**

6           Matthew Tisdale testified that he resided at his brother Jon's  home at the

7    time of the robbery, and was sleeping when it began.  He was confined in the bedroom

8    and told not to leave.  "Rick" was the only person he could identify, and ony saw the

9    backs of the heads of the others.

10           Police came to his workplace and asked who was present at the robbery.

11    He replied that he did not know.  They asked if he knew Emilio Torres, and he yes, but

12    they did not ask if Torres was there the night of the robbery.

13           He testified that he remembers his Declaration under penalty of perjury,

14    and that  Paragraph seven is true.  That paragraph concerns police officer David

15    Souza's showing the brothers two photographic line-ups to determine whether either of

16    them could identify the men who committed the robbery.   In Matthew Tisdale's opinion,

17    Souza misrepresented the two line-ups shown.  During the first line-up, containing about

18    six photos, Detective Souza asked Matthew if he recognized any of the photographs as

19    persons present at the robbery.  Matthew told Souza that he recognized Yoyo and Ricky

20    as members of the group who forced their way into the home.  Matthew stated that

21    neither Mil nor his other brother, Antonio, were included in the first photo line-up.

22    Matthew was then shown a second line-up of about four photos.  Detective Souza asked

23    if he knew any of the men in the photos, to which Matthew responded that he knew Mil

24    and his brother, Antonio.  Matthew's Declaration asserts that he stated clearly that

25    neither Mil nor Antonio were present at the home on the night of the robbery.

26           Regarding paragraph eight of his Declaration, Matthew testified he is quite

1  sure that Mil's previous attorney never spoke to him about the case, and that "until now"

2  he was never given the opportunity to speak freely or make a statement about who was

3  present during the robbery.

4         During cross examination, Matthew Tisdale repeated that he had been

5  confined in the bedroom by Ricky during the robbery.  He looked out of the door, but it

6  was dark and he could only see "figures."  He recalls speaking to an officer after the

7  event, but does not recall anyone saying not to call the cops.  He does recall Jonathan

8  getting on the phone with the police right after it happened.

9         Matthew Tisdale testified that he was contacted to give his statement, and

10 that he believes his Declaration under penalty of perjury was in his own words, to the

11 best of his memory.

12        Matthew acknowledged that Ricky had told him while he was confined in

13 the bedroom during the robbery that there was "a problem with Mil and your brother."

14 Matthew asked Jonathan right after the event if Mil was there, and Jonathan said "no."

15

16 **JONATHON TISDALE'S TESTIMONY:**

17        Upon being asked the first question of his direct examination, Tisdale took

18 a paper from his pocket, causing the court to notify counsel that "the witness is taking

19 notes from his pocket.  Some document."

20        Thereafter,  the following exchange took place:

21              Q.     BY MR. SANDERS:  Can I ask–

22              A.     I'm just trying to read what I said.

23              Q.     What are you reading from?

24              A.     What I – my declaration that I wrote down.

25              THE COURT:  Sir, at this point we need to know what
                you remember.  Not what was written down.
26

1        THE WITNESS:  What I remember?

2        Q.        BY MR. SANDERS:  Just to the best of your
                   recollection, Mr. Tisdale.  Very briefly.
3
         A.        People came in my house, took everything that I had, beat
4                  me up.

5        In response to further questioning, Tisdale testified that he knows Emilio,

6   who lived down the street, but Emilio was not at the house and did not take part in the

7   assault.

8        Tisdale said he remembers the Declaration he made in 2005.  He was

9   given a copy of the Declaration while on the witness stand, reviewed it at length, and

10  testified that it is true. When asked to state what happened in his own words with regard

11  to paragraph five, he proceeded to read the Declaration.

12        The Court stated "Sir, I believe he wants your own words. Not for you to

13  read it," which resulted in the following exchange:

14        THE WITNESS: Oh. I don't understand your
                   question here.
15
         Q.        BY MR. SANDERS:  Well, I mean, if
16                 those are your own words, if you feel
                   comfortable reading it–
17
         A.        That's why I'm reading it.
18
         THE COURT:  Okay.
19
         Q.        BY MR. SANDERS:  I'm sorry for
20                 the confusion.  Go ahead.

21        A.        Just read them?

22        Q.        Yeah.

23        Tisdale proceeded to read paragraph five of the Declaration.

24        With regard to paragraph nine of his Declaration, Tisdale testified that

25  Torres' defense counsel did not come to talk to him.

26        Counsel for the respondent began cross examination by stating:

Q.    Mr. Tisdale, if you wouldn't mind not referring to that unless you specifically need to refresh your recollection.

A.    Okay.

Q.    I just want to see what you recall aside from that.

A.    Okay.

At that point in his testimony, Tisdale took a long drink of water.  He then said that the "main face" he remembers was Yoyo.  Five minutes later, his head was hit, he was bleeding, and it was over.

Tisdale then acknowledged that there were multiple men present.  He also acknowledged that he had said in his statement that he recognized the men from seeing them at Mil's home.  Asked who Mil is, Tisdale said he is a friend, and  that Mil's real name is Emilio.

When counsel asked whether Tisdale knew the men through Emilio Torres, the Court interrupted:

THE COURT:  Just a minute.  Sir, every time she asks you a question, you refer to this statement.  Would you please turn it upside down and not refer to it unless you are unable to recall, and then she will allow you to refer to your statement.  Please turn it over.  Thank you.

Tisdale was then asked about possible inconsistencies in his statement and his in court testimony.  Tisdale explained that his statement that he recognized the men because he had sometimes seen them around Mil's home referred only to Yoyo and Ricky, although the statement said "When I opened the door, there were about five or six men outside.  I recognized them."

This exchange followed:

BY MR. SANDERS:  Excuse me, Your Honor.  May my client refer to the statement she's reading from?

THE COURT:  Well, I would like to know if he

22

1    remembers first.  And then if he can't.

2    Tisdale then said that "them" referred to Yoyo and Ricky.

3    Tisdale stated that during the robbery he was pushed backward and

4   against the kitchen counter, so that he hurt all over.  Tisdale related that he was dragged

5   into the living room and punched, and there was blood.

6    Tisdale testified that he does not remember being told not to call the cops

7   or he would be killed.  Property was taken from his home.  He was not told that he would

8   get the property back when "you fixed this."  He did not call the police that night, but did

9   go to the hospital.  Asked what he told the people at the hospital when asked how he

10   was injured, he responded that he does not remember.  In response to the question

11   whether he had given false information to the hospital to prevent them from calling the

12   police, he responded "no."  He was not afraid that the police would be called.  He does

13   not remember whether officers came to his home that night after he returned from the

14   hospital. He also could not remember if he received stitches at the hospital.

15    Asked why he waited to report the robbery to the police, Tisdale testified

16   that he "had some thinking to do because of my children."  He does not recall speaking

17   to his girlfriend, Christy, about whether they both should report the robbery.

18    Tisdale spoke with an officer about two days after the crime.  He did so

19   "because right and wrong made me decide to do it."

20    After pausing for another drink of water, Tisdale testified that he bought

21   marijuana from Emilio, but he did not tell the officer that he had accepted mail for Emilio

22   in exchange for a discounted rate on marijuana. During the mail fraud investigation,

23   Tisdale did not tell the police that the mail was for Emilio, but did give them Emilio's

24   address after "they threatened me."

25    Jonathan testified that he does not recall identifying a person with the

26   nickname "Loader" as one of the people at the robbery, but he does know a person

named Loader, who is Emilio's brother.  He does not recall Loader's real name.  Asked if his real name is "Tony," Tisdale responded "yes."  (In a police report by Officer Vincent Francois, it is noted that the suspect Medrano identified "Loader" as Anthony Torres.)

Tisdale went on to deny recalling telling police officers many of the statements attributed to him in police reports.  He did acknowledge giving the officers pages from a police report which had been left at his home.  He then continued to deny multiple other statements allegedly made by him and contained in the police reports. Tisdale  denied telling someone from the District Attorney's office that he had moved his children to live with their mother in Las Vegas as a result of the robbery, but acknowledged that their mother does live in Las Vegas.  Thereafter he denied making any other statements to police.

On redirect examination, Tisdale affirmed the truth of the testimony he had given thus far, and the truth of the contents of his Declaration, including that he had not been shown any of the police reports.  He testified that he was never contacted by defense counsel for Torres, or anyone representing Torres.

Tisdale acknowledged that he was shown a photographic lineup by Officer Souza, and testified that he had denied that Torres was at his home the night of the robbery.

**ROSA TORRES' TESTIMONY:**

Rosa Torres testified that she is the mother of Emilio Torres and that she recalls both the events of December, 2000, and those leading to the plea bargain.  She testified that she was at every hearing.  They retained a lawyer, Mr. Peters, but when they could no longer pay him the Court appointed William White to represent him after the preliminary hearing.

Ms. Torres testified that she spoke with Mr. White from once to twice a

week, and sometimes as much as four or five times in the course of a week to relate

information from Emilio.  She stated that from beginning to end, her best guess was that

she contacted Mr. White a "couple of hundred" times.  Emilio would ask her to call White

because White would not go to see him at the county jail, and she would relate Emilio's

questions.

Ms. Torres testified that she knew both Jonathan and Matthew Tisdale

because they and their children visited her home all the time to go swimming.  She had

never met Christy Nixon, Lisa Richards, or Jonathan Randall Blackburn.  Her son,

however, was told that all five of these individuals were supposed to testify against him,

so he called her and asked her to tell Mr. White that he needed to interview every one of

them.

Ms. Torres testified that she called and relayed the message to Mr. White

on several occasions.  Asked why she called several times, she responded:

> Because I'm pushy, and I'm always wanting to know where
> we're at.  Okay, Mr. White, did you get ahold of them?
> Where are we now?  Did you get ahold of them before our
> next hearing?  When are you going to interview them?
> What's going on?  Where are we?  That's why I was always
> calling.

Ms. Torres testified that Mr. White told her that they had all been

interviewed by the D.A.'s office, and were all going to come in and testify against Emilio.

Mr. White never interviewed them.

When asked if White said he would interview the witnesses, Ms. Torres

responded, "He'd refuse to.  He never would.  He didn't do it.  He would say he was, but

he never did it."

Asked specifically about Jon Tisdale, Ms. Torres responded that Mr. White

said he would send an investigator out to talk to him, but did not do so.  The other four

were also not interviewed.

1    Asked if White ever discussed subpoenaing those five individuals for trial,

2    Ms. Torres responded "no."

3    Asked if White ever discussed the possibility of a plea bargain with her,

4    Ms. Torres said "yes," and that it occurred just outside the courtroom, as Emilio was

5    getting ready to pick a jury.  White told Ms. Torres that every witness was there, and

6    they were going to testify against Emilio.  The best thing Emilio could do was to take a

7    plea bargain, because otherwise he could get a "30-something years" sentence.

8    Ms. Torres testified at length about this encounter.  She said that she

9    stood and argued with White, saying they did not want a plea bargain, and that White

10   needed to "...have those witnesses come forth."  She told him he needed to talk to them.

11   White, however, said no, that the D.A. had them there and they were against Emilio.  He

12   said she needed to "have him do a plea bargain," but she would not let him.

13   The Judge allowed her go in and sit beside Emilio in the courtroom, and

14   she tried to talk him out of the plea, but Emilio said that White said he had to take the

15   plea.  Everyone was there, and they were all going against him.  He told her he had to

16   take the plea, and then accepted the plea bargain.

17   Asked if her son ever talked to her about whether he was innocent or guilty

18   of the robbery charges, she responded that he had always told her that he was not

19   there.  Jose hit Jon.  Moreover, "Jose told us he hit Jon."  Emilio said that he had nothing

20   to do with the robbery and break-in, and that he and Jon were friends.

21   On cross examination, Ms. Tisdale testified that she is supportive of her

22   son and recalls him being tried for the burglary of Beezer Construction property.  She

23   testified on his behalf at that trial.  Asked if she was trying to help her son, she

24   responded no, that she was telling what she saw as the truth.

25   Asked if she recalled providing information to Mr. White shortly before the

26   trial, she responded, "Ma'am, it's been nine years.  I'm 57 years old.  No, I don't."

1    After Emilio took the plea bargain, Mr. White asked  Ms. Torres to gather

2   supporting letters for the Judge and to have lots of people in court in support of Emilio.

3   She gathered some fifty supporting letters.

4    Ms. Torres acknowledged that after the Beezer trial she was aware that

5   Emilio was still facing 27 charges in one case, and that he had other trailing cases in

6   addition.  She acknowledged that she knew her son was "in a fair amount of trouble."

7    Although White had told her that the D.A. indicated Emilio was facing "30-

8   some" years in prison if he did not take the plea bargain, she was not concerned about

9   that, because if he had gone to jury trial, and the witnesses were called and interviewed,

10   the jury would have found him innocent.

11

12   **EMILIO TORRES' TESTIMONY:**

13    The petitioner Emilio Torres testified that in December of 2000, he had

14   identity theft and possession for sale charges pending against him.  On the night of the

15   robbery he thinks he was picking his little brother up from college, as his brother's Blazer

16   had broken down and Emilio was taking him to and from evening classes.

17    Torres testified that he took no part in the events of December 21, and did

18   not know of them until after the fact.  He was charged perhaps a week later, and Bob

19   Peters was retained to represent him.  Peters subsequently dropped out, and the Court

20   appointed William White almost immediately after the preliminary hearing.

21    Torres testified that White did not go over any of the police reports with

22   him.  Torres did, however, have copies from Peters, which he read.  He testified that he

23   did not understand them, but heard the same statements read by police at the

24   preliminary hearing.

25    Asked specifically about Jonathan Tisdale, Torres testified that he had

26   known him since 1997 or 1998, and could not believe the things that Tisdale allegedly

said to the police.  He could understand it, though, as he thought Tisdale might have been mad at him for the identify theft case, for having mail sent to his house.

Asked about Matthew Tisdale, Torres testified that he also knew him well. He said that he didn't want to believe any of it, but it was right there in the police reports, which he believed.

Torres had seen Christy Nixon, but never "really talked to her."  Jon had just begun seeing her before the robbery.  Torres had seen Lisa Richards as well, perhaps outside when he was passing by the house.  He might have talked to Jon Blackburn a few times, but they were not friends.

When White began representing him, Torres asked about the police reports, and asked White to go talk to "these guys."  He asked him to at least talk to Jon and Matt; he did not know the other people.  He knew that he wasn't there, and wanted to know if the people were really saying that he was there that night.

White told Torres that he would get around to it, that he would send an investigator, and not to worry; he would get to it.

Torres told White as soon as he was assigned to the case that he was innocent, had nothing to do with it, and was not there when it happened.

Torres believed that it was about a year from the preliminary hearing until he was scheduled for trial.  In all that time, when they went to court, White would only get another extension for another month.  Torres spent 15 or 20 minutes with him, "if that" when they were in court.

Asked if White ever visited him in jail, Torres responded that he did on one occasion, "a couple of days before we were going to select a jury to go to trial for this robbery charge."  That was White's only visit to Torres at the jail, and they spoke on that occasion for about twenty minutes.

During the jail interview, White told Torres that he needed to think about

accepting a plea agreement, because all five of the witnesses were going to testify against him in court.  They would say what they said in the police reports, and if he went to trial, there was no way he would win.

Torres said that White told him he had tried to interview the witnesses, but had no luck in getting "ahold of them."  The district attorney, however, had already interviewed them, and "that's what they're saying."  He further told Torres that if he did not accept the 15 year plea agreement, then he would get more than 30 years when they lost at trial.

Asked if White had spoken to him about half time or good time credits in prison, Torres testified:

> Well, he told me since they were different cases that I'd be doing 85 percent on the other case, which I think was a total of ten years for the robbery case and five years for the other one.

Upon further inquiry, Torres testified that he would be doing 85 percent of the time on "the other one."

There followed this exchange:

Q.   As opposed to the normal 50 percent?

A.   Right.

Q.   If you have good time credits?

A.   Right.

Q.   And how did that make you feel?

Torres responded that he did not think he could explain how it made him feel. He was upset that White had not talked to the witnesses, but there was nothing he could do.  He testified that even if he had been out on bail, he would have been afraid to talk to the witnesses himself.  He had to trust and believe White, and that's what he did.

On the day set for trial, before jury selection, White and Torres had

another conversation.  Torres testified that he still was not going to take the deal.  He had told White that during the jail visit, and repeated it on the day of trial.  White said he was going to talk to Torres' Mother.  White said he had already talked to her and the best thing for him was to take the plea, and this was the last chance he would have, as once a jury was selected it was going to go to trial.

Torres asked again whether White had interviewed the witnesses.  White said no, but that all five of them were outside the courtroom, ready to start the trial after the jury was selected.  Torres testified that he saw no trial preparation by White.

Asked why he took the plea, Torres testified that getting out of prison in his mid to late 30's is a lot better than getting out in his mid to late 40's.

Torres pleaded no contest and was sentenced to 15 years, with no good time credits.  He will serve 85% of his time.  He is not eligible for half time.  Moreover, the robbery charges prevent him from being camp eligible, where he would need to serve only a third of his time.  Instead, he will serve nearly thirteen years.

On cross examination, Torres acknowledged that he was out on bail most of the time between the time of the robbery and his sentencing.  During that time he accrued new cases.  On May 24, 2002, he was arrested for domestic violence, a chop shop operation, a stolen vehicle, and receiving stolen property.  Those charges were dismissed, and he was again placed on bail.  On December 19, 2002, he was arrested for possession of burglary tools, but that charge was also dismissed.  On February 12, 2003, he was arrested for domestic violence.

The Beezer Construction burglary and December 21, 2000 robbery at issue here also occurred while Torres was out on bail in his various cases.

Torres testified that he was present with counsel at his preliminary hearing, and listened to the evidence presented.  He heard that credit cards in the names of others were found in his room and in his home.  He testified that he does not recall that

letters were found.  He does remember that the officers found a book with personnel information for Department of Justice employees on his bed, and that Brandon Silva told officers that he had stolen the book for Torres.  There was also testimony about blank alien registration cards in his room.  An assault weapon and a nine-millimeter pistol were found.  Methamphetamine and scales were recovered, as were packaging materials and a large quantity of marijuana.  There was a stolen car in his garage.

Torres recalls Judge Abbott informing him that he was facing 37 years and eight months, with multiple strikes, and he understands the significance of a strike. He acknowledged that he was convicted of all charges in the Beezer trial, despite his defense that he was only picking up a friend and giving him a ride.  Moreover, he understood that after the Beezer trial he was still facing the 27 count case, as well as other cases.

Torres testified that he had considered Jonathan Tisdale a friend and was angry that Tisdale had told police about the fraudulent mail.  Torres' brother is Antonio, also known as Tony Torres.  He also knows Yoyo, whose real name is Jose Polido, a friend.  Adrian Medrano is a friend from school.  Enrique or Rick Torres is Emilio's brother.  He also knows Carlos Madrigal.

Torres acknowledged that at the preliminary hearing he heard testimony that a bloody fingerprint identified as his own was found on the police report left at Jonathan Tisdale's house during the robbery, and that the police report, minus the pages left at Tisdale's home, was found at his own home.

Torres testified, however, that a number of people other than himself stayed with him at his house, and that in November he had left his home and moved back in with his mother.

Torres testified that he did not remember seeing in the police report that Adrian Medrano told the police that on December 21, 2000, Medrano and Ricky were on

their way home from work when Torres called them to stop at Jonathan Tisdale's house because Torres needed a truck, or that Medrano's statement also said that Emilio was already at the house, as were Loader and Yoyo.

Torres said that he thinks he may have read in the police report that his cousin's ex wife, Sara Espinoa, told police officers that Emilio took records from All-Safe Construction, where she was employed. He did not recall her saying that she received a free or reduced rate on marijuana for allowing him access to the records.

Torres also did not recall reading in the police report that Espinosa had said that Torres had a temper and had beaten a man known as Dude for telling on him, and that although Dude initially pressed charges, he later changed his mind.

Torres was shown a copy of his Declaration signed on August 7 in Susanville, with no year noted. Torres said he signed the statement a couple of years ago. He acknowledged that in that statement he did not say anything about repeatedly telling his attorney that he was not at the robbery, or that he did not commit the robbery.

Torres acknowledged that in his second Declaration filed with the Court, he added more information.

On redirect examination, Torres was asked what he understood to be the meaning of paragraph six of his Declaration, in which he stated that he pleaded no contest only after his attorney advised him it was highly unlikely that he could convince a jury that he was not guilty, given the number of witnesses and the physical evidence against him. Torres responded that it means "I pretty much am saying I didn't have anything to do with that robbery."

**TESTIMONY OF WILLIAM WHITE, ESQ.:**

William White, who was appointed as counsel for Torres just following the preliminary hearing, was called as a witness for the respondent. He testified that at the

time of the federal evidentiary hearing he had been practicing criminal law for twenty two years.  He has a private practice, but is on the Sacramento Conflict Panel, at level four, qualified to handle all cases including homicide, but not death penalty cases.

After White was appointed to represent Torres, his client was out on bail a significant amount of time, and picked up several new cases.  Asked why Torres' cases went on for a couple of years, White responded that he did not know, as he did not represent him the entire time.  Torres, however, was agreeable to the time lapse and was not pushing the cases, as he was not in a hurry to get to trial.

White testified that he talked with Torres about his cases.  At first, before the new cases were filed, he went to White's office, and they also spoke in court.  White testified that Torres did not want to discuss the cases, and White did not force him.  White explained that this is not unusual, as "people don't want to talk about what happened."  They prefer to "talk in a roundabout way."  Torres never said that he "never did this, or I didn't do it."  Torres asked what would happen on the next court date, would he still be out, and how they could keep the bail going.

Specifically, Torres did not ever tell White that he was not at the robbery.

White testified that although it is pretty rare, he has had clients tell him that they were not at a crime.  When that occurs, it is his practice to ask where they were at the time of the offense, and to try to find evidence such as a purchase of gas, use of a credit card, appearance on a video camera some place, or someone who can verify the alibi.  He did not have that conversation with Emilio Torres.

White testified that he had an investigator available to assist with the case, and that he generally tells his clients that, but cannot specifically recall telling Torres.

White recalls that over the course of his representation of Torres, two District Attorneys were assigned to the case.  The first was Jeff Ritchard, and the second was Ron Wells, who got the case after Torres' bail ran out. White spoke with

1 Wells about the case, but Wells was difficult to pin down about the cases would
2 proceed.

3    At some point Wells made an offer of ten years, but that was rejected.
4 Shortly before trial on the Beezer Construction case, a fifteen year plea deal was
5 offered.  The offer had gone up because the case was ready for trial, and lower offers
6 often disappear at that stage of a case.  White testified that he cannot recall for certain
7 whether the fifteen year offer was made by the District Attorney or the Court.

8    White discussed the fifteen year offer with Torres, who did not "want to
9 take any deals."  White talked with Torres "a lot," but Torres rejected the offer and
10 wanted to go to trial, which they did.

11    After the Beezer case concluded and the Court found the bifurcated
12 enhancement allegation to be true, there were additional discussions about the plea
13 deal.  White testified that he discussed the possible sentencing outcome if Torres were
14 tried serially, and Judge Abbott's opinion was that the time would be in the 30 year range
15 at the low end, and not much more at the maximum, but from 30 to 35 years at the
16 minimum.  Wells, the prosecutor, was present during those discussions.  White himself
17 had calculated Torres exposure at 35 years, and e-mailed that to Wells, who agreed with
18 his calculation.

19    White talked with Torres about his sentence exposure.  Torres was subject
20 to a strike for each person in the house at the robbery.  He was also charged with
21 residential burglary, which is a strike, and dissuading a witness, which carried a strike.

22    Asked why strikes were a concern for Torres, White explained that if he
23 had two strikes which did not result from the same transaction, it would be a serious
24 concern for a young person such as Torres, as it is easy to pick up a new felony and go
25 to prison for life.  White said Torres understood that.

26    White testified that during his representation of Emilio Torres, he spoke

1   with his client's mother both in person and by telephone.  They discussed Emilio and his

2   court appearances.  They "got along pretty well."

3          White recalls discussing evidentiary matters regarding the Beezer case,

4   but "we never talked about the other cases."  White called Ms. Torres as a witness in the

5   Beezer trial.

6          White was aware of the police report which had a fingerprint "that came

7   back to Mr. Torres."  The report also had blood on it, which connected Torres to the

8   scene of the robbery.  White testified that although not conclusive, this was strong

9   evidence.

10         After the Beezer trial was lost, White recommended that Torres take the 15

11  year deal, which included one strike.  White explained that it is always up to the client

12  whether to take a plea deal.

13         It was White's opinion that Torres would be convicted on the robbery case,

14  because the police report was at the house.  Moreover, he was identified not only by the

15  people in the house who knew him, but by a man who was not his brother, but was

16  there, caught by the police, and said that Emilio was there.  Further, "he was going after

17  these people who had ratted on him in the prior case," which gave him a motive.  White

18  believed that the state had a "pretty strong case."

19         White testified that he does not interview everyone mentioned in a police

20  report.  He does do so if he thinks it will be fruitful, such as if a client says "hey, I wasn't

21  there."  In Torres's case, he could then have interviewed his brother, who was there, and

22  Mr. Medrano, to find out "why he is lying about him being there."  On the other hand,

23  interviewing witnesses can limit cross examination and argument, as witnesses may

24  speak of extra things "that just sort of wrap a person up a little tighter."  He does not

25  interview a person unless he has reason to think something is inconsistent in the

26  statement, or doesn't seem right.  There are many reasons to re-interview a witness,

1   particularly if a client states that he was not there.

2       The result in Torres' case is sometimes called a global disposition, in which

3 all pending cases are wrapped together, and some are dismissed.  In this case, the

4 parties arrived at a number of years to be served in prison, and the number of strikes,

5 and then determined what charges should be pled to.

6       On cross examination, White testified that he does not recall exactly how

7 many court appointment cases he had at the time of the Torres case, but the number is

8 usually around ten to twelve.  It is also normal for him to have one or two private cases.

9       White acknowledged that he is aware that police officers are sometimes

10 overzealous, erroneous, or intentionally lying in a report or testimony.

11       White knew that the robbery case was very serious and was aware of the

12 fingerprint.  He had discovery indicating that someone from the Sacramento Crime Lab

13 found that the latent print came back to Torres.

14       White acknowledged that on the day of trial he had not yet received a

15 witness list, so he did not know if the forensic specialist was there to testify about the

16 fingerprint.  He testified that he "wasn't planning on going to trial."

17       White further acknowledged that on the Torres case he could have spent

18 $1,000 on investigation without stating a cause or need, and could have exceeded that

19 amount upon a showing of justification.

20       Asked to explain why he thought a robbery case with five witnesses on

21 which there were police reports did not necessitate interview of the witnesses, White

22 spoke of the background of the case.  Tisdale knew Torres, and had explained the

23 connection, with Torres getting mail at that house, and that Tisdale got a reduced price

24 on "weed" for allowing mail to go to the house.  Moreover, Tisdale had told the police

25 what happened. Torres had a motive to commit the offense.  Further, there were "easier

26 people" to ask about the cases, including Torres' brother who was present during the

beating.  White said it seemed to him that the brother would have called to say that Emilio was not there, or Emilio himself would have told White that he was not there, and the witnesses were lying.

White testified that if "that were the case" he would have interviewed the witnesses, or perhaps shown them a lineup to see if they knew the difference between Emilio and his brother, or were mistaken or had a motive to lie.  White said that he did not have "any of those suspicions."

Upon further questioning, White affirmed his testimony that nobody asked him to investigate the police reports, or told him that the witnesses might have been falsely quoted in the reports.

White testified that he does not recall Torres ever telling him that he heard evidence at the preliminary hearing in this case which he thought was incorrect.

## V.  FINDINGS OF FACT

Eight witnesses testified at the evidentiary hearing.  Each was carefully observed by the undersigned as to demeanor and apparent truthfulness.

## CHRISTY NIXON:

Christy Nixon testified that she was at the Tisdale home on the night of the robbery, sitting on the couch.  She may have heard some words, but could not see anything.  Although Jon Tisdale is now her ex-husband, she does not know who his friends were at the time of the robbery.  Specifically, she did not know Emilio Torres, although Randy Blackburn testified at the evidentiary hearing that Nixon was Jonathan's girlfriend at the time of the robbery.

Nixon testified that she was never contacted by the police or interviewed

concerning the robbery, and was never asked if Emilio was there, and in any event, she does not know him.  She remembers the police from November, prior to the robbery, but not afterwards. Nixon did acknowledge that things were taken from the home and that she was frightened.

Nixon did not seem overly nervous or apprehensive at the evidentiary hearing, but her testimony was simply not credible.  She essentially testified that she remembered only that she was there the night of the robbery and knew that people came to the home and took things, but she did not remember talking to the police, or for that matter, to Jon Tisdale about the robbery.  She was adamant that she did not know Emilio Torres despite Officer Fuenzalida's testimony at the preliminary hearing that she told him that when the intruders entered the house she tried to go upstairs, but Mil grabbed her and sat her on the couch. She also cannot recall speaking to Officer Souza, or telling him that she saw Emilio, or that Jon told her that Emilio was there.

Nixon does not just contradict the testimony of the two police officers, she professes to not even recall being contacted and interviewed by them, despite the fact that she was witness to a serious, violent robbery.

The undersigned finds the testimony of this witness not credible.

**LISA RICHARDS:**

Lisa Richards was interviewed by Detective David Souza, who testified at the preliminary hearing that Richards could not identify any of the intruders at the robbery.  She offered only the hearsay statements that Jon Tisdale had told her that Mil was the one who had done it, and that Matthew Tisdale said that all the men were family members.  At the federal evidentiary hearing, Richards testified that she does not recall the hearsay statements attributed to her.  She further testified that she has never met Emilio Torres, and does not know him.  Until the statement given during the federal

proceeding, long after the robbery, she does not recall ever being interviewed about the robbery, by either the police or defense counsel.  On cross examination, she was able to verify certain events, such as the injuries to Jon Tisdale, his statement that money had been taken, and that he was taken for medical treatment that night.  She denied that Jon told her Mil had committed the crime, and that Matthew had told her all the suspects were family members.  She further acknowledged that she was uncertain as to her statement that she had never been interviewed by the police, but she knew she was not interviewed by anyone in uniform.

This witness appeared calm and truthful at the evidentiary hearing, but could offer no evidence regarding whether Emilio Torres was present during the robbery.

**JON RANDALL BLACKBURN:**

Detective Souza testified at the preliminary hearing that while Blackburn could have seen some of the events at the robbery, he could not identify any of the assailants.  Souza did testify that Blackburn identified certain items taken during the robbery, including the Nextel 1600 cell phone, which belonged to him.  At the federal hearing, Blackburn rebutted Souza's testimony by saying that the phone had not been stolen, but he had turned it in to his boss "as lost" the day before the robbery.

Blackburn appeared sullen and defensive at the evidentiary hearing, insisting, for example, that during the robbery he did not fear for his safety and had never told anyone that he feared for his safety, although he and his girlfriend Lisa Richards moved with her child from Tisdale's house the night of the robbery.  Blackburn's answers to all questions were brief and clip, sometimes curt.

The undersigned finds that Blackburn was not forthright in his efforts to respond to questioning.  Specifically, it is unlikely that he had reported his cell phone as lost prior to the robbery, as it was found during the execution of a search warrant on

January 1, 2001, subsequent to the robbery, at the property of Emilio Torres, whom Blackburn professed not to know, although he acknowledged that he knew of Torres, and knew him by sight.

**MATTHEW TISDALE:**

Detective Souza testified that Matthew had reported that he was in the garage during the robbery and could not see Emilio Torres, but heard his voice.

At the evidentiary hearing, Matthew Tisdale testified that he was confined in his bedroom during the robbery and saw no one other than "Rick" (Ricky Torres). He acknowledged that he told the police that he knew Emilio Torres, but stated that they did not ask him if Torres was at the robbery. They did ask him who was present at the scene, and he told them he did not know.

The testimony of this witness that the police did not ask him if Torres was present at the robbery is simply not credible in view of his own testimony that he told them that he knew Emilio Torres.

**JONATHAN TISDALE:**

It was clearly difficult for the lawyers to question this witness, as he appeared incapable of speaking without direct reference to the Declaration under penalty of perjury he had given some five years after the robbery. When counsel for the petitioner insisted that he state what he remembers, very briefly, just to the best of his recollection, he responded, "[P]eople came in my house, took everything that I had, beat me up."

It required effort to elicit details from Jon Tisdale, always accompanied by his efforts to refer to his Declaration. He testified that he knows Emilio Torres, who lived down the street, but that Emilio was not at the house and did not take part in the assault.

1    Tisdale acknowledged remembering the Declaration he made in 2005.  He

2  was then handed a copy of the Declaration while on the witness stand, and reviewed it

3  at length before testifying that it is true.  This despite his prior identification of the

4  document he had pulled from his pocket in response to the first question, as "my

5  declaration that I wrote down."

6    Asked to state what happened in his own words with regard to paragraph

7  five, he proceeded to read the Declaration.  Advised by the Court to use his own words,

8  he was rescued by counsel, who told him he could read, "if those are your own words, if

9  you feel comfortable reading it."  Tisdale responded "That's why I'm reading it."

10    Counsel for the respondent began her cross examination by asking Tisdale

11  yet again to not refer to the document unless he specifically needed to refresh his

12  recollection.  Tisdale then took a long drink of water before attempting that task.

13    He testified that the "main face" he remembers is Yoyo.  Five minutes later,

14  his head was hit, he was bleeding, and it was over.

15    Counsel was able to elicit that there were multiple men, and Tisdale

16  acknowledged that in his Declaration he recognized them from seeing them at Emilio's

17  home.

18    When counsel asked whether Tisdale knew the men through Emilio

19  Torres, the Court again addressed the witness concerning his reference to the

20  Declaration each time he was asked a question, and instructed him to turn the document

21  over.

22    The next question asked about possible inconsistences in his statement

23  and his court testimony, prompting counsel for the petitioner to ask the Court to allow

24  him to refer to the statement respondent's counsel was "reading from."

25    Tisdale gave few specifics and did not confirm most of the testimony given

26  by the officers at the preliminary hearing.

1	Tisdale testified that he does not remember whether officers came to his
2	home that night after he returned from the hospital.

3	Asked why he delayed reporting the robbery to the police, Tisdale said that
4	he needed to think "because of my children."  He did speak to an officer about two days
5	after the crime "because right and wrong made me decide to do it."  He then paused to
6	drink more water.

7	The testimony given by this witness is given in more detail, supra, in the
8	section on the evidentiary hearing.  The details just given are reiterated to provide the
9	reader with a sense of the extreme difficulty this crime victim evinced while testifying
10	under oath about an assault upon himself, of which his friend, Emilio Torres, stands
11	convicted.

12	The undersigned finds the testimony of this witness to be wholly incredible.
13	Whether his apparent apprehension stemmed from knowledge that he had previously
14	given statements at serious odds with his present testimony, or apprehension of
15	retaliation by either authorities who could press that matter of false statements on one
16	occasion or the other, or by someone else, is of no consequence.  He was clearly
17	nervous and far more concerned with not deviating from his Declaration under penalty of
18	perjury than with answering truthfully what he recalled about the events of the robbery.
19
20	**ROSA TORRES:**

21	Rosa Torres, mother of the petitioner, did her very best for her son.  She
22	testified in the Beezer trial, states that she was at every hearing in the robbery case,
23	called Mr. White hundreds of times, insisting that he interview the witnesses to the
24	robbery, all to no avail.  She strongly resisted the plea bargain, encouraging her son to
25	reject it. She testified that Emilio had told her he had nothing to do with the robbery, as
26	he and Jon Tisdale were friends. She testified that Jose hit Jon, and "Jose told us he hit

Jon." [Jose Pulido pleaded to beating Jon Tisdale.]

The undersigned does not credit the testimony of this witness.  She was sure of herself, even smug, and confident of her ability to convince.  She wanted to help her son, both before and after the plea, but she either did not understand the obvious benefit of the plea bargain to Emilio, or truly believed that she could convince a new jury of his innocence, despite her failure to do so in the Beezer case.

**EMILIO TORRES:**

The petitioner, Emilio Torres, testified that he read the police reports and heard the police officers testify during his preliminary hearing, and essentially could not believe that his friends had said such things about him.  He acknowledged that he was not innocent of everything, but insisted that he was not involved in the robbery, which is the offense currently preventing him from receiving as much reduction in time to be served as he would like.  He spoke as though he was and is bewildered by the witness' alleged statements to police, despite acknowledging that Jonathan Tisdale had reason to be angry at him for "having mail sent to his house."

Of course, Jonathan Tisdale was the primary witness in the robbery case. He was the one who during the investigation unequivocally identified Emilio Torres as being present at the robbery and assault.  Most of the other "witnesses" had said either little or nothing to incriminate Torres.

Torres insisted that he had told his lawyer, William White, that he was innocent, and further asked him to interview the witnesses.  Torres did not testify that he had urged White to press his case to trial so that he could be exonerated.  He was dismissive of White's efforts on his behalf.  He testified, "I didn't  – I mean, he had his little briefcase.  That was it.  I didn't see any witness list. I didn't see anything, any preparation for trial, nothing."

43

1        He further testified, logically, that getting out of jail in his 30's was better

2  than getting out in his 40's.  As already noted, Torres had read the police reports and

3  listened to the police officers' testify during his preliminary hearing.  He knew perfectly

4  well that the forensic evidence presented at the preliminary hearing would likely be more

5  abundant at trial after further testing.  Torres was also aware of the abundance of

6  evidence obtained by search warrant at his own home.  He must have been aware in

7  addition that Jose Pulido, a/k/a Yoyo, who pleaded guilty to the robbery,  might testify

8  against him in hopes of securing a better outcome in his own case.  In short, the

9  undersigned does not credit Torres' testimony that he would not have taken the deal and

10  instead would have proceeded to trial had counsel interviewed the witnesses or

11  otherwise undertaken additional investigation, even if he expected the witnesses to

12  testify favorably for him at trial.

13

14  **WILLIAM WHITE:**

15        William White, counsel for Emilio Torres beginning after the preliminary

16  hearing, testified that he has been a criminal defense lawyer for most of his career, as

17  detailed, supra. During the course of his career, he has gotten to know many of the

18  Judges on the Sacramento County Superior Court bench, and the Assistant District

19  Attorneys who prosecute cases before them.

20        When assigned to represent Emilio Torres, who was out on bond at that

21  time, White met with him both  at his office and in court.   The first case pending at that

22  time was the identity theft case.  During the course of his representation of Torres, his

23  client accrued new charges for several offenses, but he remained on bail for a significant

24  time.

25        White testified that Torres was agreeable to remain on bail, and did not

26  wish to push the cases to trial.  Torres did not want to discuss the facts of the cases, but

1  was concerned about what would happen each time a court date was scheduled, and

2  about how to "keep the bail going."

3        White testified that Torres never told him that he was not at the robbery at

4  Tisdale's home.  Had he done so, White would have attempted to establish an alibi

5  defense. Although he had an investigator at his disposal, he saw no reason to interview

6  the witnesses who had already given statements to the police, and neither Torres nor his

7  mother asked White to do so.

8        Faced with a client with multiple cases, already convicted by jury and

9  facing sentencing on one of them, and with the potential of a very long sentence and

10  multiple strikes on both that case and others, White concentrated on developing a global

11  plea agreement under which Torres would face a maximum of fifteen years in prison and

12  one strike, for all of his pending cases.

13        White did not hesitate to acknowledge that he saw no reason to interview

14  the witnesses, who to the extent that they inculpated Torres at all, were essentially

15  consistent in their descriptions of the events of the robbery during their independent

16  statements to the police, which were corroborated by physical and forensic evidence

17  against his client, who had a motive to commit the robbery.

18        White also acknowledged that he had spoken with Ms. Torres many times,

19  and said they got along well.  He testified that no one told him that the witnesses to the

20  robbery might have been falsely quoted in the police reports.

21        White testified forthrightly and logically, explaining his reasons for pursuing

22  the defense of Emilio Torres as he did.  The undersigned fully credits the testimony of

23  this witness.

24  /////

25  /////

26  /////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## VI.  CONCLUSIONS OF LAW

### A.      Applicable Law for Federal Habeas Corpus

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

### B.      Applicable Law for Ineffective Assistance of Counsel

In the context of a guilty plea, a petitioner is denied effective assistance of counsel when counsel's plea advice resulted in an involuntary plea.  *See Tollet v. Henderson*, 411 U.S. at 267-68.  Under the applicable standard of *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), it must first be shown that, considering all the

46

1  circumstances, counsel's performance fell below an objective standard of

2  reasonableness.  *Strickland*, 466 U.S. at 687-88.  A strong presumption exists, however,

3  "that counsel's performance falls within the 'wide range of professional assistance,'"

4  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689),

5  and that counsel "exercised acceptable professional judgment in all significant decisions

6  made."  *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at

7  689).

8          A finding of ineffective assistance of counsel also requires a showing of

9  actual prejudice caused by counsel's deficient performance.  *Strickland*, 466 U.S. at

10  693-94.  Prejudice exists where "there is a reasonable probability that, but for counsel's

11  unprofessional errors, the result of the proceeding would have been different."  *Id*. at

12  694.  To show prejudice in the context of a guilty or no contest plea, there must exist a

13  reasonable probability that, but for counsels' errors, petitioner would not have pleaded

14  but would have insisted on going to trial.  *Hill*, 474 U.S. at 59; *Langford*, 110 F.3d at

15  1388.

16

17          C.     Resolution of the Claim

18          First, with respect to the objective reasonableness test, petitioner has

19  failed to show that White's performance was actually deficient.  There is no rule that

20  requires a defense attorney to interview all prospective trial witnesses.  *Bragg v. Galaza*,

21  242 F.3d 1082, 1088 (9th Cir. 2001).  The reasonableness of counsel's actions with

22  respect a decision such as whether to interview witnesses is "determined or substantially

23  influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.

24  There is no duty to investigate when the defendant does not convey to counsel any facts

25  warranting an investigation.  *Langford*, 110 F.3d at 1387.  As set forth above, petitioner's

26  testimony that he informed White that he was innocent of the robbery, and further asked

1  him to interview the witnesses, is not credible, while White's testimony that Torres never

2  claimed to be innocent of the robbery is credible under the circumstances of this case.

3  Accordingly, the fact that White did not conduct interviews or investigation to confirm the

4  witness statements as reported by police was not objectively unreasonable.  Under the

5  facts of this case, White simply had no reason to do so.  Faced with what appeared to

6  be a very strong case for the State, combined with the potential that Torrres could incur

7  a sentence in excess of 30 years with multiple strikes if found guilty at trial, White's

8  decision to forego additional investigation in favor of pursuing a global plea agreement

9  acceptable to his client was perfectly reasonable and fell within the wide range of

10 professional assistance available.

11         Torres has also failed to demonstrate the required element of prejudice.

12 The evidence  belies his assertion that he would have proceeded to trial had counsel

13 interviewed the witnesses, even if counsel had ascertained that their trial testimony

14 would not match the information in the police reports.   Petitioner's no contest plea on

15 the robbery count did not stand alone; it was part of a package deal that disposed of

16 multiple cases and counts, including those on which he had already been convicted by a

17 jury.  The plea resulted in the attribution of only one strike for petitioner, whereas he

18 could have received multiple strikes if he had proceeded to trial.  Emilio Torres

19 understood the seriousness of the charges he faced and the extent of his exposure if

20 found guilty.  He was also aware of the extent of the State's evidence against him.

21 Under these circumstances, it is simply not plausible that Torres would have rejected the

22 plea agreement and proceeded to trial on the robbery count, but for counsel's alleged

23 failure to interview the victims/witnesses.  Torres is not entitled to relief for his claim of

24 ineffective assistance of counsel.

25 /////

26 /////

48

VIII.  CONCLUSION

For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 20 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 1, 2010

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

49